David E. Leta (1937)
Michael A. Gehret (11890)
Timothy J. Dance (11553)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah  84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800
Email: delta@swlaw.com
       mgehret@swlaw.com
       tdance@swlaw.com

Attorne*ys for Defendant*
    *JP Morgan Chase Bank National Association*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **GRB ENTERPRISES, LLC**, a Utah limited liability company, and GREGORY BLANCHARD, an individual,<br><br>Plaintiffs,<br>v.<br><br>**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a national banking association<br><br>Defendant. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Case No. **2:11-cv-833 DAK**<br><br>Honorable Dale A. Kimball |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, JPMorgan Chase Bank, National Association ("**JPMorgan**"), through counsel, respectfully submits this Memorandum in Support of their Motion to Dismiss the Complaint of Plaintiff GRB Enterprises, LLC ("**GRB**") and Plaintiff Gregory Blanchard ("**Blanchard**").

## I.  INTRODUCTION

GRB is a Utah limited liability corporation.  In 2007, it borrowed money from JPMorgan through a variable rate loan to finance the acquisition of a motorcycle dealership in Park City, Utah.  To hedge against interest rate fluctuations in connection with the loan, GRB also entered into an interest rate swap transaction (the "**Swap Transaction**") with JPMorgan.  GRB defaulted under the terms of the Swap Transaction by failing to make payments on December 6, 2010, January 6, 2011 and February 6, 2011, and as a result, JPMorgan exercised its contractual right to terminate the Swap Transaction.  As a consequence of this termination, GRB became obligated to pay $138,810.95, plus accruing interest and costs, to JPMorgan.

The gravamen of Plaintiffs' Complaint is fraud in the inducement and breach of contract. Because the agreements signed by Plaintiffs contain complete merger and integration clauses, controlling New York law precludes assertion of a fraud claim.  And, while Plaintiffs try their best to muddle the contract terms, the written agreements are clear and unambiguous.  Thus, the Complaint should be dismissed under Fed.R.Civ.P. 12(b)(6) because it fails to state a claim.

## II.  FACTUAL BACKGROUND

### A.  THE UTAH LOAN AND SWAP AGREEMENTS

GRB is a Utah limited liability company.  On or about April 6, 2007, GRB signed a promissory note (the "**Note**") with JPMorgan and borrowed $2.4 million to finance the acquisition of a Honda motorcycle dealership in Park City, Utah (the "**Dealership Loan**"). (Complaint, ¶ 7).  In October 2007, GRB executed, among other things: (a) a Business Loan Agreement, attached as Exhibit 1 (the "**Business Loan Agreement**"), incorporating the previous Note; (b) a Deed of Trust in favor of JPMorgan on certain real property located in Park City, Utah, attached as Exhibit 2 (the "**Deed of Trust**"); and (c) three agreements which, together, set forth the parties' Swap Agreement, attached as Exhibits 3, 4, and 5.  Blanchard also signed a

personal guaranty, which ostensibly is the reason for his appearance as a party-plaintiff in this action. (Complaint, ¶ 10; Blanchard Guaranty attached as Ex. 6).[1]

The three parts of the Swap Agreement are: (1) the 2002 ISDA Master Agreement (Ex. A to Complaint, "**Master Agreement**"); (2) Schedule to the Master Agreement (Ex. B to Complaint, "**Schedule**"); and (3) an Interest Rate Swap Transaction Confirmation (Ex. C to Complaint, "**Confirmation**").[2]  These agreements together constitute a single agreement. (Master Agreement, § 1(c)).  Each agreement contains an express merger clause, disavowing reliance upon any prior oral or written representations. (Master Agreement, § 9(a); Schedule, Part 4, § 11(h)(i) and (ii); Confirmation, § F(a) and (b)).  In addition, both the Master Agreement and the Schedule contain a provision that selects New York as the governing law of the Swap Agreement. (Master Agreement, § 13(a); Schedule, Part 4, § 7.)

Absent a termination event or a default, the Swap Agreement has a termination date of April 6, 2012. (Confirmation, § A).  Plaintiffs allege that they understood that "this swap was a hedge on the interest rate being paid on its … loan", which was a variable interest rate (Ex. F to Complaint).  The Swap Agreement was a hedge in that if interest rates went up, GRB would pay more interest under the loan, but would receive some funds back under the Swap Agreement, and vice versa.  (Complaint, ¶ 11).

---

[1] Because Plaintiff has specifically referenced the business loan transaction with JPMorgan in the Complaint, (Complaint ¶¶ 37, 69), it is appropriate for the Court to consider the attached exhibits to this Motion as they are all part of the loan transaction. GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). But, even if the Court believed that the attached documents are not properly considered on a motion to dismiss, JPMorgan would request that the Court invoke Federal Rule of Civil Procedure 56 and treat this Motion as a motion for summary judgment. Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

[2] The Master Agreement, Schedule, and Confirmation were attached as Exhibits A, B, and C to Plaintiff's Complaint, and are re-attached here for the Court's convenience as Exhibits 3, 4, and 5.

**B.     GRB'S DEFAULT UNDER THE SWAP AGREEMENT**

The Dealership Loan was paid off in November 2010. (Ex. F to Complaint). GRB, however, failed to meet its ongoing payment obligations under the Swap Agreement. Specifically, GRB failed to make payments on December 6, 2010 and January 6, 2011 as required under the terms of the Confirmation and Sections 2(a)(i) and (ii) of the Master Agreement. On January 26, 2011, GRB's counsel announced that no future payments under the Swap Agreement would be forthcoming (Ex. F to Complaint). On February 1, 2011, and then again on February 3, 2011, JPMorgan provided GRB with written notice that it had failed to timely make payments when due under the Swap Agreement, and demanded that GRB remedy such failure by February 7, 2011. (Ex. G to Complaint). GRB failed to cure the payment deficiency on or before the first Local Business Day after JPMorgan provided notice of such failure to GRB as required under Section 5(a)(i) of the Master Agreement. On February 8, 2011, JPMorgan provided GRB with notice that (a) an Event of Default had occurred and was continuing pursuant to Section 5(a)(i) of the Master Agreement, and (b) JPMorgan designated February 9, 2011 as the Early Termination Date pursuant to Section 6(a) of the Master Agreement. (Ex. H to Complaint). In accordance with the terms of the Swap Agreement, on February 10, 2011, JPMorgan demanded that GRB pay the Early Termination Amount of $138,810.95.[3] (Ex. I to Complaint). GRB has refused to pay the amount that is due and owing to JPMorgan under the Swap Agreement, and remains in default of its obligations.

---

[3] Above and beyond GRB's payment defaults and flat declaration that it would make no additional payments, the payoff of the underlying loan also gave JPMorgan an additional basis upon which to terminate the swap agreement. The Schedule provides that "it shall be an Additional Termination Event" if "the Loan Agreement shall be paid or prepaid in full, expire, terminate or otherwise cease to be in full force and effect…." (Schedule, Part 1, § 7). This "Additional Termination Event" was a "Termination Event" under the Master Agreement (§ 5(b)(vi)), which gave rise to a right to terminate by JPMorgan. (Master Agreement, § 6(b)(iv)). If exercised, this right also would have given rise to an Early Termination Date, (Master Agreement, § 6(c)), and Plaintiffs' liability for the Early Termination Amount, (Master Agreement, § 6(d)).

The Early Termination Amount is calculated pursuant to Section 6(e) of the Master Agreement. JPMorgan calculated that amount and provided notice of the same to GRB on February 10, 2011. (Ex. I to Complaint). The Early Termination Amount consists of two parts: the "the Close-out Amount … determined by the Non-defaulting Party," plus any amounts past due (which consisted of the unpaid December 2010, January 2011 and February 2011 payments). The Close-out Amount is defined in the Master Agreement (p. 22) generally as the amount of losses or costs incurred by JPMorgan under then prevailing circumstances in replacing, or in providing the economic equivalent of, the material terms of the terminated Swap Agreement. JPMorgan is granted authority to calculate this amount under the Swap Agreement. (Master Agreement, Ex. 3, p. 23 and § 6(e)).

## VI.  STANDARD OF REVIEW

The Court should dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because it fails to state any claims upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although Rule 8(a)(2) requires only a short and plain statement of the claim, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The Tenth Circuit has interpreted the combination of Iqbal and Twombly as follows:

> The [United States Supreme] Court has explained that two working principles underlie this [pleading] standard. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Thus, mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice; a plaintiff must offer specific factual allegations to support each claim. And second, only a complaint that states a plausible claim for relief survives a motion to dismiss. In other words, a plaintiff must offer sufficient factual allegations to raise a right to relief above the speculative level. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether

5

the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable.

Kan. Penn Gaming, LLC v. Collins, No. 10-3002, 2011 U.S. App. LEXIS 18187, *6-7 (10th Cir. Sept. 1, 2011) (citations and quotations omitted). Here, not only is Plaintiffs' Complaint replete with formulaic recitations, labels and conclusions, the factual allegations that are contained therein are contradicted in their entirety by the plain terms of the fully integrated agreements at issue in this matter. Accordingly, Plaintiffs have not stated, and cannot state, a plausible claim for relief against JPMorgan, and their Complaint should be dismissed.

### IV.   NEW YORK LAW GOVERNS THE SWAP AGREEMENT

The parties' have selected New York as the governing law for the Swap Agreement. Accordingly, New York applies to the substantive law underlying the allegations in the Complaint.[4]

To decide the effect of a contractual choice-of-law clause, courts look to the choice-of-law rules in the forum state. Been v. O.K. Indus., 495 F.3d 1217, 1236 (10th Cir. 2007). Therefore, this Court would look to the laws of Utah. LifeWise Master Funding, LLC v. Telebank, No. 2:00CV0495B, 2003 U.S. Dist. LEXIS 26340, *19 n.6 (D. Utah Mar. 5, 2003) (applying Utah law to determine the effect of a choice-of-law provision that selected New York law as the governing law). Utah courts generally uphold choice-of-law provisions in order to respect the intent of the parties. Innerlight, Inc. v. Matrix Group, LLC, 214 P.3d 854, 857-58 (Utah 2009) (holding that a choice-of-law provision is enforceable); Jacobsen Constr. Co. v. Teton Builders, 106 P.3d 719, 723 (Utah 2005) (agreeing with the parties that a choice-of-law provision was enforceable). In accordance with these decisions, New York Law must apply in this case.

---

[4] The Schedule, Part 4, § 7, states: "Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." (Ex. 4). Section 13(a) of the Master Agreement refers to the Schedule regarding the governing law and specifies: "Governing Law: This Agreement will be governed by and construed in accordance with the law specified in the Schedule." (Ex. 3).

In accordance with Utah law, New York law also gives great weight to a contractual provision that states the governing law of the contract and generally will enforce such provisions:

> Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction. A basic precept of contract interpretation is that agreements should be construed to effectuate the parties' intent. Where an agreement is clear and unambiguous, a court is not free to alter it and impose its personal notions of fairness.

Welsbach Elec. Corp. v. MasTec N. Am., Inc., 859 N.E.2d 498, 629 (N.Y. 2006) (citations omitted)); see also, Millennium Falcon Corp. v. WRD Sales, Inc., 848 N.Y.S.2d 707, 708-09 (N.Y. App. Div. 2007) ("Since the parties to the note agreed that it would be governed by Connecticut law, we must apply the substantive law of that forum in determining whether the plaintiff established as a matter of law its entitlement to recovery on the note and guaranty.")

Enforcing a contracts' choice of law provision is also supported by general contract theory. The fundamental principle underlying contract law is that agreements are construed by looking to the parties' intent. Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (N.Y. 2002). Because "the best evidence of what parties to a written agreement intend is what they say in their writing, … a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id.

In further support of choice-of-law provisions, federal courts within the District of Utah and the Tenth Circuit cite various policy reasons for upholding the intent of the parties and respecting the parties' right to choose the governing law for a contract:

> Because conflicts of law are inevitable in a federal system, parties to a contract are empowered to and frequently do choose a particular state's law to apply to the execution and interpretation of the contract. Absent special circumstances, courts usually honor the parties' choice of law because two "prime objectives" of contract law are "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract."

Brahma Group, Inc. v. Benham Constructors, LLC, No. 2:08-CV-970, 2009 U.S. Dist. LEXIS 35310, *14-15 (D. Utah Apr. 20, 2009) (quoting Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency, 174 F.3d 1115, 1121 (10th Cir. 1999) (citations omitted)).

Thus, in order to uphold basic tenants of contract law interpretation and to ensure that the agreement between the parties is given full effect, the governing law provision should be followed, and New York law should apply to the substantive portion of this Motion.

## VI.  ARGUMENT

### A.  THE COURT SHOULD DISMISS THE COMPLAINT UNDER FED.R.CIV.P. 12(b)(6)

Plaintiffs' Complaint includes counts for declaratory judgment, breach of contract, fraud and negligent misrepresentation. The first two counts are essentially contract claims, while the latter two are predicated upon alleged misrepresentations made before the subject agreements were executed. Both types of claims fail as a matter of controlling New York law.

#### 1.  Plaintiffs' Breach of Contract Claims Fail as a Matter of Law

Counts I and II of the Complaint raise three arguments: (a) the Swap Agreement does not refer to the correct business loan agreement (Complaint, ¶¶ 69-71); (b) the Swap Agreement does not "contain the essential terms" of the Early Termination Amount owed by Plaintiffs or such terms are "too indefinite and vague" and therefore there was "no meeting of the minds on the essential terms of the" Swap Agreement (Complaint, ¶¶ 68, 72-74); and (c) JPMorgan did not provide enough information as to how the Early Termination Amount was calculated (Complaint, ¶ 76). Each of these arguments fails as a matter of law.

##### (a)  Plaintiffs are wrong regarding the reference to the Loan Agreement

Plaintiffs' first argument relates to the definition of "Loan Agreement." GRB claims it did not enter in to any loan agreement in October 2007, (Complaint, ¶ 38), and that the Swap

Agreement documents do not refer to the Dealership Loan (Complaint, ¶ 71).  These allegations are contradicted by the documents themselves.  Clearly, GRB did enter into the Business Loan Agreement of October 2007, as evidenced by the attached Exhibit 1.  This Business Loan Agreement incorporated the Note used for the Dealership Loan. (Business Loan Agreement, Exhibit 1, p. 1).  Accordingly, the Swap Agreement, which refers to the Business Loan Agreement, does reference the Dealership Loan.  Moreover, this argument is beside the point.  The primary default of GRB under the Swap Agreement was a payment default, as detailed in the correspondence from JPMorgan to GRB which is attached to the Complaint.  This default is independent from the payoff of the loan.

### (b) The agreements are enforceable pursuant to their terms

Plaintiffs next claim that the parties never had a "meeting of the minds" and, therefore, the entire Swap Agreement is unenforceable.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999) (citation omitted).  There must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Id. "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."  Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981) (citation omitted).  However, "not all terms of a contract need be fixed with absolute certainty." Express Indus., 715 N.E.2d at 1053.  "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." May Metro. Corp. v. May Oil Burner Corp., 49 N.E.2d 13, 15 (N.Y. 1943).  "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but "parties . . . should be held to their promises." Cobble Hill Nursing Home v. Henry & Warren Corp., 548 N.E.2d 203, 206 (N.Y. 1989).

> [W]hile there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be "pedantic or meticulous" in interpreting contract expressions. (1 Corbin, Contracts § 95, at 396 [1963]; see also UCC 2-204[3].) […] The conclusion that a party's promise should be ignored as meaningless "is at best a last resort."

Id. (footnote and citation omitted).

Here, the manifestation of mutual assent is contained within the Swap Agreement itself, which Plaintiffs cannot deny they executed.. See, e.g., Master Agreement, § 3(a)(v) (By executing the Master Agreement, GRB represented that "[i]ts obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their terms…."). This is not a case of a so-called "preliminary agreement" or of a non-binding letter of intent. All parties recognized that these agreements were binding contracts pursuant to their terms. "Under New York law, once it has been established that the parties to a contract have agreed on the essential terms, courts are encouraged to exercise discretion as they interpret the contract in favor of enforcing the various promises made by the parties." Paper Corp. of United States v. Schoeller Technical Papers, Inc., 807 F. Supp. 337, 345 (S.D.N.Y. 1992).

Plaintiffs' also claim that the Swap Agreement lacks essential terms because there is no "mathematical formula" to calculate the "Close-out Amount," but instead JPMorgan retained discretion to calculate the amount. (Complaint, ¶¶ 72-73). There is no requirement, however, that a contract contain a "mathematical formula" to be enforceable. See Cobble Hill Nursing Home, 548 N.E.2d at 206. In fact, contracts regularly vest discretion in one party or another, tempered by either express contractual parameters (as here) or by the implied covenant of good faith and fair dealing, to do certain things in the future, and such contracts are regularly upheld

by the courts. A recent New York case upheld such a provision in a contract. In <u>Emposimato v CIFC Acquisition Corp.</u>, a party claimed that a security purchase agreement was merely a preliminary agreement because the parties' duties to perform their obligations were contingent on the satisfaction of certain conditions. No. 601728/2008, 2011 N.Y. Misc. LEXIS 898, *21 (N.Y. Sup.Ct. March 7, 2011). One such condition was that the purchaser of stock, CIFC, was not obligated to continue with the stock acquisition unless it was satisfied, in its sole discretion, with certain information. <u>Id.</u> at *21-22. The court ultimately summarized the principle this way:

> [T]he fact that the SPA made CIFC's obligation to proceed to culmination of the Stock acquisition contingent upon its satisfaction, in its sole discretion, with the Schedules, Pre-Acknowledgment Diligence and Sensitive Diligence did not render the SPA a merely preliminary agreement which was unenforceable as regards the parties' respective obligations with respect to consummation of the Stock sale (see e.g. <u>Matter of Associated Teachers of Huntington, Inc. v Board of Educ., Union Free School Dist. No. 3, Town of Huntington</u>, 33 N.Y.2d 229, 233-234, 306 N.E.2d 791, 351 N.Y.S.2d 670 (1973) [finding that the fact that one party to a contract would be "the final judge" of whether another party "met the conditions necessary to receive the benefits of the agreement [did] not negate the existence of an enforceable contract right," inasmuch as "[b]oth common law and statutory law recognize the existence of contractual obligations where either the satisfactory performance of one party or the existence of conditions precedent is left solely to the good faith judgment of the other party"]; <u>Outback/Empire I, Ltd. Partnership v Kamitis, Inc.</u>, 35 A.D.3d 563, 563, 825 N.Y.S.2d 747 (N.Y. App. Div. 2d Dep't 2006) [rejecting the contention of the defendant therein that the obligations of the plaintiff under a lease were illusory, because, although the contract contained provisions which "allowed the plaintiff, in its sole and absolute discretion, to terminate its obligations under the lease," the covenant of good faith and fair dealing, which is implied in every contract, required the plaintiff "to carry out its contractual obligations incident to the exercise of its discretion in good faith"]).

<u>Id.</u> at *22; <u>see also</u>, <u>Paper Corp.</u>, 807 F. Supp. at 346 ("Hallmark's discretion regarding the volume of its purchases and the fact that Paper Corporation might not have been able to sell the

paper if Schoeller's price were too high do not render the agreement void or voidable. See Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 454 (2d Cir. 1977) (a requirement that a defendant's performance be "acceptable" to the plaintiff does "not render the agreement illusory in the sense that it is not supported by consideration … [m]ore importantly, [the court does] not agree that [the plaintiffs] had 'unbridled' discretion. New York courts would in all events impose an obligation of good faith upon the [plaintiff's] exercise of that discretion.").

Here, the fact that the Close-out Amount calculation is left to JPMorgan's discretion, if and when it becomes relevant, does not render the Swap Agreement unenforceable. Rather, the Swap Agreement itself provides the measure: JPMorgan must "act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable amount." (Master Agreement, p. 23). Importantly, Plaintiffs **do not allege** that JPMorgan violated this duty. There is no allegation that JPMorgan failed to act in good faith, failed to use commercially reasonable procedures or that the amount determined was not a commercially reasonable amount. Consequently, Plaintiffs have failed to state a claim and their Complaint should be dismissed.

### (c) The breach of contract claim should be dismissed because Plaintiffs cannot plead causation or damages

Plaintiffs' sole claim for breach of contract is an alleged failure to provide to Plaintiffs adequate details of how the Close-out Amount was calculated. (Complaint, ¶ 76) As noted above, however, Plaintiffs' Complaint does not actually challenge how the Close-out Amount was calculated. Moreover, the Complaint is void of any allegations that the Close-out Amount was calculated incorrectly, in bad faith, or that JPMorgan failed to use commercially reasonable procedures. Accordingly, even if it is assumed as true that the notice somehow lacked specificity about the details of the Close-out Amount calculation, Plaintiffs have not adequately pled either causation or damages.

A breach of contract action requires the party to plead the following elements: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (applying New York Law). Causation is an essential element of damages, as "a defendant must prove that a defendant's breach directly and proximately caused his or her damages. Id.; see also, Franconero v. Universal Music Corp., No. 02 Civ. 1963, 2011 U.S. Dist. LEXIS 15259, *15-16 (S.D.N.Y. Feb. 11, 2011). In addition, failure to plead damages is fatal to a breach of contract action. LNC Invs., Inc. v. First Fid. Bank., 173 F.3d 454, 465 (2d Cir. 1999) (applying New York Law). Where the alleged breach of contract does not logically relate to any damages, the claim should be dismissed. Rose Lee Mfg. v. Chem. Bank, 186 A.D.2d 548, 551 (N.Y. App. Div. 2d Dep't 1992); see also, Gordon v Dino De Laurentiis Corp., 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1st Dep't 1988) ("In the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint, and the pleadings must set forth facts showing the damage upon which the action is based.").

Assuming, as the Court must, that the Close-out Amount was properly calculated (given the absence of any claim to the contrary), the mere fact that Plaintiffs allege that JPMorgan did not fully comply with the notice provision does not state a cause of action. Plaintiffs fail to plead allegations of fact showing damages caused by this alleged defect in JPMorgan's notice letter. In particular, Plaintiffs do not specify how not knowing the exact calculations of the Close-out Amount directly and proximately caused them damages. Because Plaintiffs have failed to plead causation and damages, their breach of contract claims fail as a matter of law and must be dismissed.

### 2. Plaintiffs' Fraud and Misrepresentation Claims Must be Dismissed

New York law requires dismissal of Plaintiffs' fraud and negligent misrepresentation claims. Simply put, there can be no fraud based upon alleged misrepresentations when the

plaintiff signs a conclusive, written agreement which expressly disavows any reliance upon earlier representations. In a nearly identical case, the Supreme Court of New York applied established New York jurisprudence to dismiss these types of claims, given the merger and integration clauses in the parties' written agreements. JPMorgan Chase Bank NA v. Controladora Commercial Mexican SAB De CV, 920 N.Y.S.2d 241; No. 603215/08, 2010 NY Misc LEXIS 5656, *17-18 (N.Y. Sup. Ct. March 16, 2010).

In Controladora, JPMorgan and CCM had entered into numerous swap agreements, consisting (as here) of the master agreement, a schedule, and a confirmation. Id. at 5. When CCM defaulted, JPMorgan sued and CCM asserted, among other things, fraud in the inducement. Id. at 16. The Court granted JPMorgan's initial motion for breach of contract and dismissed CCM's fraud and negligent misrepresentation claims. Id. at 17. Citing a long string of New York cases, the Court noted that, "[i]t is well settled that claims for fraud and negligent misrepresentation are barred where the party asserting the claim contractually agreed not to rely on the other party's representation." Id. at 17 (citing cases). The court held specifically that:

> CCM's fraud and negligent misrepresentations counterclaims and affirmative defense fail as a matter of law. In the ISDA Agreement, CCM expressly disclaimed any reliance on JPMorgan in connection with the Transactions and specifically stated that it was able to understand the Transactions. The ISDA Agreement states:
>
> > **Relationship Between Parties**. Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):
> >
> > **(a) Non Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other

> party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.
>
> **(b) Evaluation and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms conditions and risks of that Transaction. It is also capable of assuming and assumes, the risks of that Transaction.
>
> (ISDA Agreement, Schedule, Part 5 [6] [a] and [b]). This same language was included in every confirmation for the Transactions [citation omitted].
>
> Thus, the plain terms of the ISDA Agreement bar CCM's affirmative defenses and counterclaims for fraud and negligent misrepresentation.

Id. at 18-20. Other cases addressing the same non-reliance and merger language in swap agreements have similarly dismissed fraud allegations by the borrower. See, e.g., CDO Plus Master Fund Ltd. v. Wachovia Bank N.A., No. 07 Civ. 11078, 2009 U.S. Dist. LEXIS 59540, *12-14 (S.D.N.Y. 2009) (judgment on the pleadings); Republic National Bank v Hales, 75 F. Supp.2d 300, 315-16 (S.D.N.Y. 1999).

Here, the very same language relied upon by the Court in Controladora is present in the Swap Agreement with GRB (Schedule, Part 4, § 11(h)(i) and (ii)); see also Master Agreement, § 9(a); Confirmation, § F(a) and (b)). Accordingly, for the same reasons, Plaintiffs' fraud and misrepresentation claims are barred and should be dismissed.

## IV. Conclusion

JPMorgan respectfully requests that Plaintiffs' Complaint be dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs have failed to state a plausible claim for relief, and all allegations are contradicted by the plain language of the Swap Agreement. In particular, the plain language illustrates that there was a meeting of the minds as to all parts of this agreement. Although the Swap Agreement leaves some discretion to JPMorgan in calculating a Close-out amount, there are good faith standards governing this calculation, and Plaintiffs never argue this

standard was breached. In addition, Plaintiffs only allege formulaic recitations of the elements of a breach of contract cause of action and make conclusory allegations that there have been damages in this case. Finally, Plaintiffs' fraud and misrepresentation claims are unequivocally barred. The Plaintiffs signed a conclusive, written agreement which expressly renounces all reliance on earlier representations. When there is a complete merger and integration clause such as this, New York law bars fraud and misrepresentation claims. Ultimately, all causes of action in this case fail to state a plausible claim for relief and should, therefore, be dismissed.

DATED this 6th day of October, 2011.

          SNELL & WILMER L.L.P.

          By   /s/ Michael A. Gehret
            David E. Leta
            Michael A. Gehret
            Timothy J. Dance
            *Attorneys for Defendant*
            *JP Morgan Chase Bank National Association*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October, 2011, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

>Bruce J. Boehm
>John Morris
>McKay, Burton & Thurman
>170 South Main Street, Suite 800
>Salt Lake City, Utah 84101

>Dennis K. Egan
>Kotz, Sangster, Wysocki & Berg, PC
>400 Renaissance Center, Suite 3400
>Detroit, MI 48243

/s/ Michael A. Gehret