David E. Leta (1937)
Michael A. Gehret (11890)
Timothy J. Dance (11553)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email: dleta@swlaw.com
       mgehret@swlaw.com
       tdance@swlaw.com

*Attorneys for Defendant*
  *JPMorgan Chase Bank National Association*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **GRB ENTERPRISES, LLC**, a Utah limited liability company, and **GREGORY BLANCHARD**, an individual,<br><br>    Plaintiffs,<br>v.<br><br>**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, a national banking association<br><br>    Defendant. | **DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)**<br><br><br>Case No. **2:11-cv-833 DAK**<br><br>Honorable Dale A. Kimball |

Defendant, JPMorgan Chase Bank, National Association ("**JPMorgan**"), through counsel, respectfully submits this Reply Memorandum in Support of JPMorgan's Motion to Dismiss Under Fed. R. 12(B)(6).

14178549.4

# TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................................. 1

II. Statement of Issues ..................................................................................................... 2

III. Argument .................................................................................................................... 2

    A. New York Law Applies ................................................................................... 2
    B. The Swap Agreement is Fully Integrated and Unambiguous ........................... 5

        1. GRB's Misrepresentation Claims Lack Plausibility ............................. 6
        2. The Swap Agreement is Fully Integrated, Barring Reliance on Pre-Contract Statements ............................................................................. 7
        3. The Swap Agreement is Unambiguous ................................................ 9

    C. GRB has Failed to Plead Plausible Facts to Suggest it has been Damaged ......... 12

IV. Conclusion ................................................................................................................ 13

## I.   INTRODUCTION

As a preliminary matter JPMorgan notes that GRB's memorandum in opposition (the "**Response**") is a combined memorandum in opposition to the motion to dismiss *and* a memorandum in support of a non-filed motion for partial summary judgment. [Docket No. 22][1] After realizing its oversight, on December 15, 2011, GRB filed a separate motion for partial summary judgment and a supporting memorandum. [Docket Nos. 26 and 27] Accordingly, this Reply only addresses GRB's arguments in opposition to JPMorgan's Motion to Dismiss. JPMorgan will file a separate memorandum in opposition to GRB's December 15, 2011 motion for partial summary judgment within the timeframe dictated by the Federal Rules of Civil Procedure, assuming any of the GRB claims survive JPMorgan's Motion to Dismiss.

To rule in favor of GRB on JPMorgan's Motion to Dismiss, this Court must completely disregard the intent of the parties as manifest by the plain and unambiguous terms of the fully integrated agreement. GRB's claims in its Complaint are based primarily on allegations that: (1) it relied on market materials received prior to the signing of the Swap Agreement;[2] (2) the Swap Agreement is ambiguous; and (3) JPMorgan breached the Swap Agreement because it did not provide an adequate Early Termination Amount[3] calculation. These arguments fail for three primary reasons. First, controlling New York law bars the fraud and misrepresentation claims because the Swap Agreement contains express merger and non-reliance clauses. Second, GRB attempts to muddle the contract terms by looking at specific provisions in a vacuum. The

---

[1] GRB failed to file a separate motion for partial summary judgment at the time it filed its combined memorandum.
[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in JPMorgan's Motion to Dismiss.
[3] The Master Agreement, GRB's Complaint ("**Complaint**") Exhibit A, § 6(e), describes how the Early Termination Amount is determined. This Early Termination Amount includes a Close-Out Amount, which is defined in the Master Agreement, Complaint Exhibit A, § 14. For ease of reference, JPMorgan refers to the amount payable after an event of default as the "Early Termination Amount."

14178549.4

1

intentions of the parties are readily discernable from the plain terms of the entire contract. Third, even if GRB could establish that JPMorgan failed to provide an Early Termination Amount calculation, which it cannot, GRB has failed to plead sufficient and plausible facts that it was in anyway damaged by such a failure of *notice or disclosure*. GRB does not contend that the Early Termination Amount was *incorrect,* was *incorrectly calculated,* or that GRB owes nothing.[4] Accordingly, GRB has failed to state a claim for relief, and JPMorgan's motion to dismiss should be granted.

## II.   STATEMENT OF ISSUES

1. Does New York law apply in this case?

2. Has GRB set forth sufficient factual allegations to state a claim for relief that is plausible on its face?

## III.   ARGUMENT[5]

### A.   New York Law Applies

Not surprisingly, GRB asks this Court to ignore a fully integrated contract that unambiguously specifies the intent of the parties, namely, to have the Swap Agreement governed by New York law, without regard to the choice of law doctrine.[6] Under Utah law, this choice of

---

[4] Of course, GRB argues fraud in the inception as a basis for attempting to avoid its obligations under the Swap Agreement, but, absent this argument, it does not contend, or even attempt to show, that JPMorgan's determination of the Early Termination Amount was incorrect.

[5] As discussed above, GRB's Response originally purported to be a combined memorandum in opposition to the motion to dismiss and in support of a cross-motion for partial summary judgment. In conjunction with its request for partial summary judgment, GRB included a "statement of facts" in its combined memorandum. GRB has now filed a separate motion for summary judgment as well as a separate supporting memorandum. Accordingly, JPMorgan will not respond in this brief to the statement of facts contained in the Response. Instead, JPMorgan will file a separate opposition to GRB's motion for summary judgment and respond to GRB's purported facts in that brief.

[6] Schedule, Complaint Exhibit B, Part 4, § 7 [Docket No. 2]; Master Agreement, Complaint Exhibit A, § 13(a); Declaration of Diane Sciacca in Support of JPMorgan's Motion to Dismiss ("**Declaration of Diane Sciacca**"), ¶ 4, attached hereto as Exhibit A.

law provision must be enforced "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." *Brahma Group, Inc. v. Benham Constructors, LLC*, No. 2:08-CV-970, 2009 U.S. Dist. LEXIS 35310, *14-15 (D. Utah Apr. 20, 2009) (quoting *Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency*, 174 F.3d 1115, 1121 (10th Cir. 1999)).

In determining whether to enforce a similar choice of law provision, the Utah Supreme Court in *Innerlight, Inc. v. Matrix Group, LLC*, 2009 UT 31, ¶¶ 14-16, 214 P.3d 854, explained that that court must begin "by looking within the four corners of the contract to determine the parties' intentions, which are controlling." *Id.* at ¶ 14. "If the language within the four corners of the contract is unambiguous, . . . *a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law.*" *Id.* (emphasis added). The court found that there was no ambiguity in the contract and enforced the choice of law provision set forth therein. *Id.* at ¶ 16. Here, as in the *Innerlight* case, the intention of the parties is plain on the face of the Swap Agreement, which clearly states that it shall be governed by the laws of New York.[7] Accordingly, this Court should enforce the intent of the parties and apply New York law to this dispute.

While GRB has attempted to argue that would adopt the restatement approach to choice of law provisions, all of the cases cited by GRB for this proposition *pre-date* the *Innerlight* holding. Moreover, even if the Court were to apply the restatement approach, New York law would still apply because: (1) New York has a substantial relationship to the parties and there is a reasonable basis for the choice; and (2) the application of New York law would not be contrary to any fundamental Utah policies.

---

[7] Master Agreement, Complaint Exhibit A, § 13(a) [Docket No. 2]; Schedule, Complaint Exhibit B, Part 4, § 7 [Docket No. 2].

First, New York has a substantial relationship to the parties and the transaction. JPMorgan has offices in New York City.[8] The Confirmation states that the Swap Agreement originated out of New York and that the New York Office of JPMorgan booked the Swap Agreement and received all payments and deliveries with respect to the Swap Agreement.[9] In addition, the Master Agreement, which is published by the International Swaps and Derivatives Association, Inc., is a uniform document for over-the-counter derivative transactions.[10] ISDA agreements contain a choice of law provision with respect to which the parties designate the governing law that is to apply to the agreement and all transactions thereunder.[11] The election of New York law is standard for domestic Master Agreements.[12] Accordingly, there is a reasonable basis for the choice of law in the Swap Agreement.

GRB tries to confuse the issue by referring to JPMorgan's arguments for the transfer of venue. In its *Motion to Dismiss or in the Alternative, Motion to Transfer Venue*, however, JPMorgan consistently stated that New York law applies.[13] The transfer of venue motion

---

[8] Declaration of Diane Sciacca, ¶ 5.
[9] Confirmation, Complaint Exhibit C, § C (stating that the Office of JPMorgan is in New York) [Docket No. 2]. Under § 10(c) of the Master Agreement, "[t]he Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing...the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction." Master Agreement, Complaint Exhibit A, § 10(c) [Docket No. 2]. Furthermore, in the Schedule, the parties agreed that § 10(a) of the Master Agreement would apply to the Swap Agreement. Schedule, Complaint Exhibit B, Part 4, § 3 [Docket No. 2]. Under § 10(a), "each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking office or its jurisdiction of incorporation or organization, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office. . . ." Master Agreement, Complaint Exhibit A, § 10(a) [Docket No. 2]. Therefore, the parties expressly contracted to have the JPMorgan New York office be the relevant Office for this transaction. In addition, the Agreement specifically considers the New York office to be the same as the office of the state of incorporation in terms of recourse.
[10] Declaration of Diane Sciacca, ¶ 2.
[11] Declaration of Diane Sciacca, ¶ 3.
[12] Declaration of Diane Sciacca, ¶ 3.
[13] Response, Exhibit M, page 5 ("Indeed, even the Swap Agreement is governed by New York law. . .").

requested Utah as the forum state because the real property is located in Utah[14] and the only place that the lien could be foreclosed was in Utah. It did not request that Utah law apply to the contract, as GRB suggests.

Second, Utah law does not conflict with New York's definitive rule that claims for fraud and misrepresentation are barred when the party asserting the claim contractually agreed not to rely on the other party's representations.[15] It is "well-settled" under Utah law that, "a party cannot reasonably rely upon oral statements [that are] contrary [to] written information." *Gold Standard Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1067 (Utah 1996). The reasoning behind this approach is that:

> The one who complains of being injured by such a false representation cannot heedlessly accept as true whatever is told him, but has the duty of exercising such degree of care to protect his own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances and if he fails to do so, is precluded from holding someone else to account for the consequents of his own neglect.

*Id.* (quoting *Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982)). Accordingly, regardless of which law applies to this dispute, GRB's fraud and misrepresentations claims should be dismissed.

### B.   The Swap Agreement is Fully Integrated and Unambiguous.

GRB's Response, distilled to its essence, is based on the following two arguments. First, GRB argues that, notwithstanding a plain and unambiguous integration clause, GRB was entitled to rely on pre-contract marketing materials and other representations provided to it prior to signing the Swap Agreement. Second, GRB argues that there could be no meeting of the minds

---

[14] Response, Exhibit M, pages 5-13 [Docket 22].
[15] GRB only argues that Utah and New York laws conflict on the fraud and misrepresentation claims. It never argues that New York and Utah would reach separate conclusions on the breach of contract or declaratory relief actions. Therefore, even if the Court looks to the conflict of law test set forth by GRB, so long as New York and Utah law do not conflict on the fraud and misrepresentation claims, which they do not, New York law should apply to all claims.

because the Swap Agreement is ambiguous. As discussed below, both of these arguments fail as a matter of law. Accordingly, JPMorgan's motion to dismiss should be granted.

1. GRB's Misrepresentation Claims Lack Plausibility.

GRB's fraud and misrepresentation claims are based on allegations that it received pre-contract marketing materials stating there would be no early termination fee associated with Swap Agreement. This assertion, of course, is completely implausible upon review of the marketing materials purportedly provided to GRB prior to execution of the Swap Agreement. Specifically, Exhibit D to the Complaint contains the PowerPoint presentation allegedly provided to GRB by JPMorgan's representatives. This PowerPoint presentation clearly contains the following statements at pages 2-4: "Swap maturity can be longer or shorter than debt maturity;" "Swaps can be terminated prior to maturity without pre-payment penalties . . . if interest rates are lower, *Client [GRB] pays swap market value to JPMorgan;*" and "the swap transaction is separate from the underlying loan, but may be linked for default and credit purposes."[16] On page 4 of this same presentation, there also is an illustration, with the preface "numbers in parentheses represent amounts *payable by you to JPMorgan.*"[17] In other words, GRB's claims that JPMorgan made representations that there would be no fees associated with the termination of the Swap Agreement are contradicted by the very marketing materials that GRB alleges contain such representations. Moreover, the Master Agreement that GRB ultimately signed clearly provides for an Early Termination Amount and the circumstances under which such amount will be due.[18] Accordingly, GRB's claims that it was misled into believing there would be no fees for

---

[16] Complaint Exhibit D, pgs. 2-3 [Docket No. 2] (emphasis added).
[17] Complaint Exhibit D, pg. 4 [Docket No. 2] (emphasis added).
[18] Master Agreement, Exhibit A, § 6(e)(i) [Docket No. 2].

early termination of the Swap Agreement lack plausibility. Both the PowerPoint and the Swap Agreement attached to GRB's Complaint evidence that GRB was fully aware of the possibility of such fees.

        2.        **The Swap Agreement is Fully Integrated, Barring Reliance on Pre-Contract Statements.**

Even if JPMorgan had represented to GRB that there would be no early termination fees under the Swap Agreement, GRB's claims still would fail as a matter of law. This is because when GRB entered into this Swap Agreement, it represented that "[i]t's obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations."[19] It also disavowed reliance upon any oral or written representations.[20] Both New York and Utah law are clear that in the face of a fully integrated agreement, the parties are not entitled to rely on pre-contract statements or marketing materials.

In New York, "courts and commentators addressing the substantive and procedural aspects of New York commercial litigation agree that the purpose of a general merger provision is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Primex Int'l Corp. v. Wal-Mart Stores*, 679 N.E.2d 654, 627 (N.Y. 1997). A merger clause, such as the one in this Swap Agreement, "accomplishes this objective by establishing the parties' intent that the [a]greement is to be considered a completely integrated writing." *Id.* GRB does not dispute that New York law bars fraud claims based upon alleged misrepresentations when the plaintiff signs a conclusive, written

---

[19] Master Agreement, Complaint Exhibit A, § 3(a)(v) [Docket No. 2].
[20] Master Agreement, Complaint Exhibit A, § 9(a) [Docket No. 2]; Schedule, Complaint Exhibit B, Part 4, § 11(h)(i) and (ii) [Docket No. 2]; Confirmation, Complaint Exhibit C, § F(a) and (b) [Docket No. 2].

agreement which expressly disavows reliance upon earlier representations.[21]  Therefore, because New York law governs the Swap Agreement, the fraud claims are barred as a matter of law.

In full accord with this rule, Utah law defines an integrated agreement as a "writing . . . constituting a final expression of one or more terms of an agreement." *City of Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 24, 233 P.3d 461.  When a contract, such as this Swap Agreement, includes an express integration clause, it is "presumed to contain the whole agreement and parties may not rely on extrinsic evidence in attempting to prove that the contract is not integrated." *Id.*

GRB cites to Utah law suggesting that extrinsic evidence is admissible to prove fraud. *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 12, 182 P.3d 326.  While that may be true in certain specific circumstances, the general proposition is inapplicable here because GRB's fraud claims are based on statements that are directly contradicted by the terms of the written agreement.  Under Utah law, a party cannot reasonably rely on oral statements when they are directly contrary to written terms. *Gold Standard Inc.*, 915 P.2d at 1067 (Utah 1996) (holding that, as a matter of law, it was unreasonable for a party to "heedlessly" continue to accept oral promises when faced with numerous written communications to the contrary).  The proposition is further supported by other Utah cases.  In *Mikkelson v. Quail Valley Realty*, a defendant realtor created a listing agreement that contained the wrong square footage of a home.  641 P.2d at 125.  The plaintiff claimed fraud because of its reliance on the listing agreement. *Id.* at 126.  The court found that the plaintiff could not have reasonably relied on the listing agreement since "he not only inspected the property but also signed, prior to closing, loan documents acknowledging

---

[21] JPMorgan's Motion to Dismiss, pgs. 13-15 [Docket No. 16]; Response, pgs. 11-12, 19-21 [Docket No. 22].

receipt of the FHA appraisal report wherein the correct footage was revealed." *Id.* In a recent October 2011 opinion, the Utah Supreme Court further clarified this principle by holding that, in the face of a fully integrated agreement, the defendant could not submit extrinsic evidence that he was "induced to enter into the agreement by a representation that [the plaintiff] was nearing completion of a new mainstream marketing website, recruiting DVD, audio CD and other marketing materials." *Young Living Essential Oils v. Marin*, 2011 UT 64, ¶ 13. Consequently, under Utah law, a party cannot claim wrongful inducement to enter into an agreement based on unilateral understandings or prior statements which are contrary to the plain terms of the integrated contract.

Thus, under New York and Utah law, GRB cannot claim to have relied on pre-contract marketing materials and representations, particularly when such alleged representations are contrary to the express terms of the Swap Agreement.

        3.     The Swap Agreement is Unambiguous.

With respect to GRB's second argument, under New York law, "whether an agreement is ambiguous is a question of law for the courts." *Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y. 1998). Ambiguity is determined by looking to the "four corners of the document, not to outside sources." *Id.* In particular, courts

> should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought. Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.

*Id.* (citations omitted). Furthermore, extrinsic evidence cannot create an ambiguity in an agreement. *Id.* at 181.

Utah law is in accord with New York law on this issue. As described above, the *Innerlight* court held that when interpreting a contract, the court begins "by looking within the four corners of the contract to determine the parties' intentions, which are controlling." 2011 UT 31, ¶ 14. "If the language within the four corners of the contract is unambiguous, . . . a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law." *Id.* A court may not consider extrinsic evidence of the parties' intent unless it first concludes that the contract is facially ambiguous, and, in no event, may extrinsic evidence be used to contradict the plain language of the contract. *See Wilson v. Johnson*, 2010 UT App 137, ¶ 8 (Utah Ct. App. 2010).

Here, GRB attempts to argue that the Swap Agreement is ambiguous for three reasons. First, GRB asserts that the terms of the Swap Agreement contradict pre-contract marketing materials. Specifically, GRB points to pre-contract marketing materials as evidence that an ambiguity exists with respect to whether an Early Termination Amount will be owed upon a termination event.[22] Under *Kass* and *Wilson*, however, the court cannot use these documents to create ambiguity when the four corners of the document are decisively unambiguous. *See Kass*, 696 N.E.2d at 180-81; *Wilson*, 2010 UT at ¶ 8. The Master Agreement expressly states that "if

---

[22] GRB argues that the marketing materials stated that there would be no "pre-payment penalties." This statement is actually a half-truth. That same section of the marketing materials goes on to say, immediately thereafter: " . . . if interest rates are lower, *Client [GRB] pays swap market value to JPMorgan*." (emphasis added) Moreover, the pre-payment penalty statement is correct. The Schedule states that "nor shall anything herein or therein be construed as, a prepayment penalty." Schedule, Complaint Exhibit B, Part 5, § 7(D) [Docket No. 2]. GRB's arguments are not supported by the plain language of the Swap Agreement or the marketing materials.

an early termination event occurs, the amount, if any, payable in respect of that Early Termination Date will be determined pursuant to this Section 6(e)" and then provides how that amount is to be calculated.[23] In the Swap Agreement that GRB signed, the four corners of the document clearly show that there would be a possible payment upon early termination and it states how that amount will be calculated. The fact that GRB may not have understood these provisions, or may not have even read them, is irrelevant. *Chun Hye Kang-Kim v. Feldman*, 121 A.D.2d 590, 590-591 (N.Y. App. Div. 2d Dep't 1986) ("[T]he fact that the plaintiff and her attorneys may have misunderstood the plain meaning of the terms of the contract is also irrelevant.").

Second, GRB argues that the Swap Agreement is unenforceable because it provides JPMorgan with the discretion to calculate the Early Termination Amount. In making this argument, not only does GRB ignore that fact that JPMorgan specifically bargained for this discretion, it also disregards the fact that contract provisions are not required to be fixed with absolute certainty. *See e.g. Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 454 (2d Cir. 1977); *Emposimato v CIFC Acquisition Corp.*, No. 601728/2008, 2011 N.Y. Misc. LEXIS 898, *21 (N.Y. Sup.Ct. March 7, 2011). Moreover, although GRB attempts to ignore them, there are identifiable standards in the Swap Agreement for computing the Early Termination Amount.[24] Accordingly, JPMorgan is not afforded complete discretion under the Swap Agreement, but must adhere to certain standards in calculating the obligation.

---

[23] Master Agreement, Complaint Exhibit A, § 6(e)(i) [Docket No. 2].
[24] Master Agreement, Complaint Exhibit A, § 6(e)(i) [Docket No. 2]; Master Agreement, Complaint Exhibit A, § 14 [Docket No. 2] (defining Close-out Amount).

Third, GRB contends that there are conflicting provisions regarding whether the payoff of the underlying loan constitutes a termination event. In support of this contention, GRB takes language out of context from the Swap Agreement and attempts to manufacture a conflict that is easily resolved by reading the document as a whole. Specifically, GRB contends that while Part 1, § 7, of the Schedule provides that the pay off of the underlying loan obligation is a termination event, Part 5, § 7(i), of the Schedule also states that the obligations of the parties under the Swap Agreement are not contingent on performance of the underlying loan obligations.[25] Part 5, § 7(ii) of the Schedule, however, goes on to clarify that it shall not be interpreted as impairing or limiting any provision referring to the repayment of the underlying obligation, i.e. Part 1, § 7, of the Schedule.[26] Accordingly, the Swap Agreement specifically provides that Part 5, § 7(i) of the Schedule shall not be read to contradict Part 1, § 7 of the Schedule.[27]

### C.  **GRB has Failed to Plead Plausible Facts to Suggest it has been Damaged.**

To survive a motion to dismiss, a complaint must contain sufficient factual allegations to state a claim for relief that is *plausible* on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949

---

[25] *See* Schedule, Complaint Exhibit B, Part 1, § 7 [Docket No. 2]; Schedule, Complaint Exhibit B, Part 5, § 7(i) [Docket No. 2].

[26] *See* Schedule, Complaint Exhibit B, Part 5, § 7(ii) [Docket No. 2].

[27] In its Complaint and its Response, GRB has continually stated that the payoff of the dealership loan was the termination event. As explained in the letters from JPMorgan, which GRB attached to its Complaint, however, the termination event was actually the failure to pay on the Swap Agreement after the dealership loan was paid off. *See* Complaint Exhibit G [Docket No. 2] ("Counterparty failed to pay $7,939.03 to JPMorgan on December 6, 2010, and $8,741.81 on January 6, 2011… the Counterparty must remedy such failure within the first Local Business Day of the receipt of the Notice or an Event of Default shall have occurred under the Master Agreement"); Complaint Exhibit H [Docket No. 2] (stating that GRB had failed to pay past due amounts owing under the Swap Agreement and notifying GRB that an Event of Default had occurred). Therefore, the failure to pay under the Swap Agreement was the Event of Default, not the payoff of the dealership loan, and GRB as well as its counsel clearly understood this. Master Agreement, Complaint Exhibit A, § 5(a)(i) [Docket No. 2]. While payoff of the dealership loan also created a right to terminate the Swap, Master Agreement, Exhibit A to Complaint, § 5(b)(vi) [Docket No. 2]; Schedule, Complaint Exhibit B, Part 1, § 7 [Docket No. 2], that was not the Termination Event in this case.

14178549.4                                         12

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Importantly, such "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. With respect to a breach of contract claim, not only is the plaintiff required to establish the existence of a contract and a breach of the same, but the plaintiff must also plead sufficient facts to plausibly establish that the defendant's breach directly and proximately caused him or her damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *see also Christensen & Jensen, P.C. v. Barrett & Daines*, 2008 UT 64, ¶ 26, 194 P.3d 931 ("[I]n a breach of contract action, the non-breaching party is required to show that the breach proximately caused the damages sought.")

Here, GRB certainly makes formulaic recitations that the failure to provide the notice of the Early Termination Amount caused it damages. On the other hand, however, GRB recites no plausible facts that it suffered any *actual damage* as a result of this alleged *failure of notice*. There is no question that based on the plain, unambiguous terms of the Swap Agreement, GRB is in default,[28] and it knew that it was in default. There also is no question based on the plain, unambiguous terms of the Agreement, that the non-defaulting party has the right to calculate portions of the Early Termination Amount.[29] GRB never contends that the Early Termination Amount was incorrect, that it does not owe $138,810.95 under the Swap Agreement, that JPMorgan failed to act in good faith, or that JPMorgan failed to use commercially reasonable procedures in calculating the Early Termination Amount. GRB only claims that it did not receive a specific detail of *how* the obligation was calculated. Any failure to provide this notice does not automatically lead to "damages," as GRB suggests. Because, GRB has failed to plead any plausible facts that it suffered any damages, GRB's claims fail as a matter of law and should be dismissed.

---

[28] Master Agreement, Complaint Exhibit A, § 5(a)(i) [Docket No. 2].
[29] Master Agreement, Complaint Exhibit A, § 6(e)(i) [Docket No. 2] Master Agreement, Complaint Exhibit A, § 14 [Docket No. 2] (defining Close-out Amount).

14178549.4                                13

## IV. CONCLUSION

Based on the foregoing, this Court should enforce the plain terms of a fully integrated unambiguous agreement and dismiss the Complaint against JPMorgan.

DATED this 20th day of December, 2011.

          By   /s/ Michael A. Gehret
            David E. Leta
            Michael A. Gehret
            Timothy J. Dance
            *Attorneys for Defendant*
            *JPMorgan Chase Bank National Association*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of December, 2011, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and delivered by CM/ECF system to the following:

>Reid Tateoka
>Bruce J. Boehm
>McKay, Burton & Thurman
>170 South Main Street, Suite 800
>Salt Lake City, Utah 84101
>
>Dennis K. Egan
>Kotz, Sangster, Wysocki & Berg, PC
>400 Renaissance Center, Suite 3400
>Detroit, MI 48243

_____/s/ Michael A. Gehret_____

# Exhibit A
# (Declaration of Diane Sciacca)

David E. Leta (1937)
Michael A. Gehret (11890)
Timothy J. Dance (11553)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
Email: delta@swlaw.com
         mgehret@swlaw.com
         tdance@swlaw.com

Attorneys *for Defendant*
   *JPMorgan Chase Bank, National Association*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GRB ENTERPRISES, LLC, a Utah limited liability company, and GREGORY BLANCHARD, an individual,<br><br>        Plaintiffs,<br>v.<br><br>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, a national banking association<br><br>        Defendant. | **DECLARATION OF DIANE SCIACCA IN SUPPORT OF JPMORGAN'S MOTION TO DISMISS**<br><br>Case No. **2:11-cv-833 DAK**<br><br>Honorable Dale A. Kimball |

I, Diane Sciacca, declare under penalty of perjury that I am over the age of 18 and that the following is true and correct:

1. I am an attorney in the Legal and Compliance Department of JPMorgan Chase Bank, National Association ("**JPMorgan**"), and have personal knowledge of all facts contained in this declaration and would testify accordingly if called to do so in a court of law.

2. The ISDA Master Agreement is published by the International Swaps and Derivatives Association, Inc. and is a uniform document for over-the-counter derivative transactions.

3. The ISDA Master Agreement contains a choice of law provision with respect to which the parties designate the governing law that is to apply to the agreement and all transactions thereunder. In my experience as a financial derivatives attorney, the election of New York law is standard for domestic ISDA Master Agreements.

4. New York law is designated as the governing law in the ISDA Master Agreement between GRB Enterprises, LLC and JPMorgan.

5. JPMorgan has offices in New York.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Dated: December 19, 2011.

Diane Sciacca
JPMorgan Chase Bank, National Association
Legal and Compliance Department
10 S. Dearborn, 6th Floor
Mail Suite IL1-0041
Chicago, IL 60603