IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **GRB ENTERPRISES LLC, and GREGORY BLANCHARD,** | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| vs. | Case No.  2:11CV833DAK |
| **JPMORGAN CHASE BANK, N.A.,** | Judge Dale A. Kimball |
| Defendant. | |

This matter is before the court on Defendant JPMorgan Chase Bank, N.A.'s Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) and Plaintiff GRB Enterprises, LLC's Motion for Partial Summary Judgment Under Federal Rule of Civil Procedure 56(c).  The court held a hearing on the motions on February 15, 2012.  At the hearing, Plaintiffs were represented by Dennis K. Egan and Reid Tateoka, and Defendant was represented by David E. Leta and Blakely J. Denny.  After hearing argument, the court took the matter under advisement.  The court has considered the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motions.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

In April of 2007, GRB Enterprises LLC signed a $2.4 million loan agreement with JPMorgan Chase Bank, N.A. ("JPMorgan") to finance the purchase of a Honda motorcycle

dealership in Park City, Utah. The Dealership Loan had a variable interest rate.

Six months after entering into the loan, GRB and Blanchard, the sole member and manager of GRB, entered into an interest rate swap agreement with JPMorgan. The purpose of the interest rate swap agreement was to hedge against interest rate fluctuations on the Dealership Loan. If interest rates went down, GRB would make payments on the Swap Agreement but would have lower interest payments on the Dealership Loan. Whereas, if interest rates went up, GRB would have higher payments on the dealership but would receive money form JPMorgan on the Swap Agreement.

The Swap Agreement contains three documents: a Master Agreement; a Schedule to the Master Agreement; and a Confirmation. Section 1(c) of the Master Agreement states that the documents form a single agreement. In the event of any inconsistencies, the Schedule prevails over the Master Agreement as does the Confirmation.

In October 2010, GRB informed JPMorgan of its intent to payoff the Dealership Loan and requested a payoff amount. On October 26, 2010, a JPMorgan employee in Arizona informed GRB that if GRB elected to payoff the Dealership Loan early, it would be obligated to pay JPMorgan a swap "breakage fee." Blanchard was confused by this response because he recalled from discussion prior to entering into the Swap Agreement that there were no penalties for pre-payment.

The parties agree that JPMorgan gave GRB a promotional presentation on the benefits of entering into the Swap Agreement. A power point of the presentation is an exhibit. The parties disagree, however, as to the meaning of the information that was provided. GRB and Blanchard believe that the Dealership Loan and Swap Agreement were linked and that pre-payment of the

Dealership Loan would not affect the Swap Agreement. The promotional materials state that the swaps can be terminated prior to maturity without pre-payment penalties.

JPMorgan, however, states that there is no penalty for pre-payment but the materials made clear that there was a breakage fee or termination value to terminate the Swap Agreement. The promotional materials provided that "swaps can be terminated prior to maturity without pre-payment penalties . . . if rates are lower, Client pays swap market value to JPMorgan." The materials also state that "interest rate swaps can be terminated prior to their maturity . . . the process involves contacting JPMorgan, obtaining a termination value for the swap and agreeing to the termination." The promotional materials also state that the maturity of the Swap Agreement can be shorter or longer than the loan.

The promotional materials explicitly state that they are a summary of proposed terms and were not intended to be a complete description of all material terms included in any subsequent transaction. The final Swap Agreement contains all of the terms of the agreement and includes a full integration clause.

After learning from JPMorgan that it sought approximately $140,000 for terminating the Swap Agreement, GRB demanded an explanation of how the number was calculated. Section 6(d)(i) of the Master Agreement requires JPMorgan to provide GRB with a statement showing in reasonable detail the close-out amount calculations, specifying any early termination amount payable, and giving details of the relevant account to which the amount is to be paid. The parties dispute whether this was provided.

JPMorgan told GRB that the "swap breakage fee reflects the difference between the rate under which GRB could execute a swap with the same terms today relative to the fixed rate,

multiplied by the duration." JPMorgan then asked GRB to call so that they could walk GRB through the calculations for un-winding the GRB swap. GRB did not call for that further discussion and considers JPMorgan's response a breach of the Swap Agreement.

In an email two days after GRB notified JPMorgan of its intent to pay off the Dealership Loan, GRB's attorney told JPMorgan that "we are still weighing whether to terminate the swap facility and pay the breakage fee. It is highly likely that we will leave the swap in place. We understand that the mortgage would remain a lien until the obligations under the swap are terminated."

On November 17, 2010, GRB paid off the Dealership Loan. GRB did not notify JPMorgan as to whether it was also terminating the Swap Agreement. However, GRB did not make its payments on December 6, 2010 or January 6, 2011. On January 26, 2011, GRB's counsel sent a letter to the JPMorgan employee in Arizona stating that JPMorgan had failed to provide GRB with a calculation of the swap breakage fee, that GRB considered JPMorgan in breach of the Swap Agreement, and that GRB would be making no further payments under the Swap Agreement.

On February 1, 2011, and February 3, 2011, JPMorgan provided GRB with written notice that GRB had failed to make timely payments under the Swap Agreement in December 2010 and January 2011 and demanding that GRB remedy its failure by February 7, 2011. When GRB did not make payment on February 7, JPMorgan did a notice of default and designated February 9, 2011 as the Early Termination Date pursuant to Section 6(a) of the Master Agreement. On February 10, 2011, JPMorgan demanded that GRB pay an Early Termination Amount of $138,810.95 and provided a calculation of the amount.

JPMorgan calculated the breakage fee or "early termination amount" pursuant to Section 6(e) of the Master Agreement. The amount consists of two parts: a "Close-out Amount" determined by the non-defaulting party and any amounts past due. The "Close-Out Amount" is defined in the Master Agreement as the amount of losses or costs incurred by JPMorgan under the then prevailing circumstances in replacing, or in providing the economic equivalent value of, the material terms of the terminated Swap Agreement. Under the Swap Agreement, JPMorgan is given the discretion and authority to calculate this amount. GRB, however, argues that Swap Agreement grants JPMorgan too much discretion in calculating the amount and that the definition of the Close-Out Amount is vague and ambiguous.

JPMorgan contends that GRB defaulted under the Swap Agreement by not paying in December 2010 and January 2011 and, thus, caused a termination event . GRB contends that its pre-payment of the Dealership Loan in November 2010 was a termination event and JPMorgan breached the swap agreement by not giving it notice of its breakage fee by the time GRB wrote to JPMorgan in January 2011.

GRB does not believe that JPMorgan gave an adequate explanation of the calculation of the breakage fee and refused to pay the amount. GRB asserts that, on April 14, 2011, after JPMorgan still failed to provide GRB with a calculation of the swap breakage fee and continued to demand payment, GRB filed suit for breach of contract, declaratory judgment, fraud, and misrepresentation in Michigan. JPMorgan filed suit in this court for foreclosure on the motorcycle dealership based on GRB's failure to pay the swap breakage fee. JPMorgan successfully moved to have venue of GRB's Michigan action transferred to this court, and the two cases have been consolidated.

DISCUSSION

JPMorgan moves to dismiss GRB's Complaint, arguing that the plain language of the Swap Agreement gives it discretion to calculate the close-out amount and the standards in the Swap Agreement were not breached. JPMorgan also argues that there was a meeting of the minds as to all material aspects of the contract and GRB fails to demonstrate how it has been damaged. Finally, JPMorgan asserts that GRB's fraud and misrepresentation claims are barred by the integration clause in the Swap Agreement.

In response to JPMorgan's motion to dismiss, GRB opposed the motion and moved for partial summary judgment in its favor on its declaratory judgment and breach of contract claims. The declaratory judgment claim asks the court to find that the Swap Agreement in unenforceable because there was never a meeting of minds and that Swap Agreement is ambiguous. The breach of contract claim alleges that JPMorgan breached the Swap Agreement because it failed to give GRB adequate notice of its close-out calculations and the sources it used in determining the amount.

Because both motions deal with the same issues, the court will analyze the motions together. Prior to dealing with the causes of action at issue, the court will first address the preliminary question of which state's law governs the Swap Agreement.

1. **Governing Law**

First, JPMorgan argues that the Swap Agreement states that New York law applies and the court should honor the choice of law provision. GRB, however, argues that Utah law should apply in this case despite the choice of law provision in the Swap Agreement because there is a conflict in the law of the two jurisdictions and Utah has a stronger interest in the dispute.

To decide the effect of a contractual choice-of-law clause, courts look to the choice-of-law rules in the forum state. *Been v. O.K. Indus.*, 495 F.3d 1217, 1236 (10th Cir. 2007). Utah courts generally uphold choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract. *Innerlight, Inc. v. Matrix Group, LLC,* 214 P.3d 854, 857-58 (Utah 2009). More specifically, Utah law provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1084 (10th Cir. 1999).

In this case, JPMorgan asserts that New York has a substantial relationship to the case because it is the place of its incorporation and where its swap agreements originate and are administered. GRB, however, asserts that New York has no other connection to the parties or underlying agreements. The agreements related to a dealership in Utah and were negotiated in Utah, Illinois, and Arizona. The discussions relating to the termination of the agreements were mainly between Michigan and Arizona. GRB's arguments, however, ignore the fact that the parties agreed to a choice of law provision in the contract and ask the court only to focus on which forum appears to have a greater relationship with the dispute. However, given the fact that the parties chose New York law to govern, the court need only determine whether that forum has a substantial relationship, not a greater relationship than Utah. While GRB claims that New

York law has no real relevance to the case, it has a substantial relationship to one of the parties in the case and there is no public policy of the State of Utah that would be impaired by the application of New York law. Therefore, the court concludes that the Swap Agreement is governed by New York law.

**2. Contract Claims**

JPMorgan argues that GRB's two contract claims, Count I for declaratory judgment and Count II for breach of contract, fail as a matter of law. As an initial matter, GRB alleges in the Complaint that the Swap Agreement does not refer to the correct business loan. However, GRB entered into a Business Loan Agreement in October 2007, which incorporated the Note used for the Dealership Loan. Therefore, the Swap Agreement, which refers to the Business Loan Agreement, referenced the Dealership Loan.

    **A. Declaratory Judgment Claim**

Next, GRB's Complaint seeks a declaration that the Swap Agreement does not contain the essential terms for a binding agreement and does not reflect a meeting of the minds between the parties. GRB argues that it has sufficiently pleaded its claim for declaratory judgment and there is no genuine issue of material fact that the Swap Agreement is unenforceable. "Contractual mutual assent requires assent by all parties to the same thing in the same sense so that their minds meet as to all the terms." *Cessna Fin. Corp. v. Meyer*, 575 P.2d 1048, 1050 (Utah 1978). GRB contends that the Swap Agreement contains no formula, methodology, or definition of how to compute the swap breakage fee and is, therefore, too indefinite to demonstrate a meeting of the minds and too indefinite to be performed. JPMorgan, however, argues that this is not a case of a preliminary agreement or non-binding letter of intent where a

meeting of the minds may be in question.  This is a case involving a detailed financial transaction that consisted of three comprehensive documents.  All parties agreed that these documents were binding as to their terms.

More specifically, GRB claims that there is no meeting of the minds because the Swap Agreement lacks essential terms.  GRB asserts that instead of providing a mathematical formula to calculate the close-out amount, it gives JPMorgan too much unfettered discretion in calculating it.  The Swap Agreement, however, provides standards for JPMorgan to use and requires it to act in good faith and use commercially reasonable procedures.  The Swap Agreement provides that JPMorgan may consider quotations for replacement transactions supplied by third parties, relevant market data in the relevant market supplied by third parties, and similar information supplied by internal sources.

There is no requirement that a contract contain a mathematical formula to be enforceable. *See Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 454 (2d Cir. 1977).  Contracts often vest discretion in one party with given parameters or a good faith standard.  While GRB contends that JPMorgan has too much discretion in the Swap Agreement, GRB agreed to give JPMorgan that much discretion and the discretion is not untethered.  The agreement cotnains specific standards for JPMorgan to follow.  Moreover, GRB does not allege that JPMorgan violated its duty to act in good faith or failed to use a commercially reasonable procedure.  Rather, GRB argues that JPMorgan failed to provide the basis for its calculation.  That claim does not support a finding that there was no meeting of the minds.  Rather, that claim relies on specific contractual provisions.

Therefore, the court concludes that there was a meeting of the minds as to all essential

terms under the Swap Agreement, the SWAP Agreement is not ambiguous, the discretion granted to JPMorgan is governed by reasonable parameters, and the terms of the Swap Agreement are sufficiently definite to be enforceable. Accordingly, the court grants JPMorgan's motion to dismiss the declaratory judgment claim and denies GRB's motion for partial summary judgment on the declaratory judgment claim.

## B. Breach of Contract Claim

JPMorgan also argues that this court should dismiss GRB's breach of contract claim because GRB cannot plead that JPMorgan's alleged failure to provide it with an explanation of its calculation caused it damages. GRB has not claimed that the close-out amount was improperly calculated. Rather, GRB alleges that JPMorgan breached the contract because it did not provide it with the underlying information necessary to determine whether the calculation was correct. JPMorgan argues that the mere fact that GRB alleges that JPMorgan did not fully comply with the notice provision does not state a cause of action because GRB has failed to state how not knowing the exact calculations used to determine the close-out amount directly and proximately caused GRB damages.

GRB argues that it has stated a valid claim for breach of contract and it is entitled to summary judgment because there is no issue of material fact that JPMorgan breached the Swap Agreement. The Master Agreement requires JPMorgan to provide GRB with a "statement (1) showing, in reasonable detail, such [Close-Out Amount] calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying . . . any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable is to be paid."

GRB argues that it asked JPMorgan to provide the calculations four times and that it has never received an adequate response. GRB contends that JPMorgan's failure to provide its calculations and supporting information, has caused GRB to face a foreclosure action on the dealership. Accordingly, GRB asserts that this is adequate causation and damages to support a breach of contract claim.

JPMorgan argues that it complied with the Swap Agreement's requirements to provide its calculations. JPMorgan states that it provided GRB with the basic methodology it used to calculate the close-out amount and that it offered to walk through the information on a telephone conference call. Furthermore, JPMorgan asserts that there is nothing in the Swap Agreement that requires it to give the information to GRB in writing and it cannot control the fact that GRB chose not to participate in the offered conference call to explain the calculations.

The court concludes that there are too many factual disputes to rule on the breach of contract cause of action at this stage of the litigation. Prior to discovery, there are questions as to when GRB believes it first requested a close-out calculation and whether JPMorgan responded in a timely, good faith manner. While JPMorgan asserts that GRB was the first to default under the Swap Agreement by failing to pay in November and December, GRB appears to argue that it was waiting for a close-out calculation amount from JPMorgan during that time. The court believes that discovery should be conducted prior to this court determining who breached the agreement and when such breach occurred. The factual disputes also preclude the court from determining whether a failure to provide the underlying calculations and information for the close-out amount would constitute a material breach of the Swap Agreement or if it is, as JPMorgan asserts, more akin to a claim for an accounting. Accordingly, at this stage of the litigation, the court denies

JPMorgan's motion to dismiss and GRB's motion for partial summary judgment on the breach of contract claim.

### 3. Fraud & Misrepresentation Claims

JPMorgan further seeks to dismiss GRB's fraud and misrepresentation claims, arguing that such claims are barred by the Swap Agreement's merger and integration clauses. Three courts looking at language similar to the Swap Agreement's language in this case have found fraud in the inducement claims to be barred by the express provisions of the agreements. *See JPMorgan Chase Bank N.A. v. Controladora Commercial Mexican SAB de CV*, 920 N.Y.S.2d 241, 2010 NY Misc LEXIS 5656, *17-18 (N.Y. Sup. Ct. March 16, 2010); *CDO Plus Master Fund Ltd. v. Wachovia Bank N.A.,* 2009 U.S. Dist. LEXIS 59540, *12-14 (S.D.N.Y. 2009); *Republic Nt'l Bank v. Hales*, 75 F. Supp. 2d 300, 315-16 (S.D.N.Y. 1999).

GRB, however, that the representations made by JPMorgan employees and promotional materials were fraudulent and misrepresented the nature of the Swap Agreement. GRB argues that Utah law does not preclude a fraud claim arising out of a contract with an integration clause. The Utah Supreme Court has held that "[w]here a contract by an explicit term purports to be integrated, we will nevertheless allow extrinsic evidence in support of an argument that the contract is not, in fact, valid. . . . We have held that extrinsic evidence is appropriately considered even in the face of a clear integration clause, where the contract is alleged to be a forgery, a joke, a sham, lacking in consideration, or where a contract is voidable for fraud, duress, mistake or illegality." *Tangren Family Trust v. Tangren*, 182 P.3d 326 (Utah 2008).

GRB argues that the promotional materials in this case support a fraud in the inducement claim because they state that there is no pre-payment penalty and GRB would not have entered

into the agreement if it knew there was a fee. However, the promotional materials refer to the termination value that may be required when pre-payment occurs. While that termination value was not characterized as a penalty, the materials make clear that a payment may be necessary depending on interest rates at the time of termination. In addition, the materials expressly state that the Swap Agreement had a different term than the underlying loan. The promotional materials further state that they are a summary of the material provisions and that terms will be defined in subsequent transactions. The court concludes that, under Utah or New York law, there is no basis for a fraud or misrepresentation claim based on the pre-contract promotional materials attached as Exhibit D to the Complaint.

To the extent that GRB's claims are based on alleged oral misrepresentations made prior to the contract, New York law is clear that parties are not entitled to rely on pre-contract statements when the contract contains a full integration clause. *See Primex Int'l Corp. v. Wal-Mart Stores*, 679 N.E.2d 654, 627 (N.Y. 1997). The merger and integration clauses in the Swap Agreement are clear and unambiguous and the court has already determined that the agreement is governed by New York law. Accordingly, JPMorgan is entitled to a dismissal of the fraud and misrepresentation claims.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART and Plaintiff's Motion for Partial Summary Judgment is DENIED. The only remaining cause of action is GRB's breach of contract claim based on an alleged failure to provide the basis for determining the close-out amount for termination of the Swap Agreement.

DATED this 12th day of March, 2012.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge